# 24-1726

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

AMTAX HOLDINGS 227, LLC,

*Plaintiff-Appellant,*

—against—

COHNREZNICK LLP,

*Defendant-Appellee,*

TENANTS' DEVELOPMENT CORPORATION,

*Intervenor-Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT**

---

L. REID SKIBELL
GLENN AGRE BERGMAN
  & FUENTES, LLP
1185 Avenue of the Americas,
  22nd Floor
New York, New York 10036
(212) 970-1600

*Attorneys for Plaintiff-Appellant*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

AMTAX Holdings 227, LLC, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, states that there is no parent corporation or publicly held corporations owning 10% or more of its stock.

# TABLE OF CONTENTS

PAGE

RULE 26.1 CORPORATE DISCLOSURE STATEMENT .................... i

TABLE OF AUTHORITIES .................................................. iv

JURISDICTIONAL STATEMENT.............................................. 1

    JURISDICTION OF THE DISTRICT COURT .......................... 1

    JURISDICTION OF THE SECOND CIRCUIT COURT OF
    APPEALS ....................................................... 1

STATEMENT OF THE ISSUES................................................ 2

STATEMENT OF RELATED CASES ........................................ 3

CONCISE STATEMENT OF THE CASE ..................................... 4

    I.    The District Court Analyzes AMTAX's Claims as Being
        Grounded in Contract ................................................. 5

    II.   The Federal LIHTC Program and Section 42 of the Code........... 9

    III.  CohnReznick Consistently Confirms the Accepted
        Interpretation of Section 42(i)(7) .................................... 12

    IV.  CohnReznick Turns on AMTAX By Performing a Secret
        Minimum Price Calculation Using a Contrived and
        Contradictory Interpretation of Section 42(i)(7) .................... 14

    V.   The Massachusetts Breach of Contract Actions .................... 15

SUMMARY OF THE ARGUMENT .......................................... 18

ARGUMENT ............................................................. 22

    I.       STANDARD OF REVIEW ON APPEAL ........................ 22

II.    THE DECISION IMPROPERLY APPLIED THE
       STANDARDS FOR SUBJECT MATTER JURISDICTION
       SET FORTH IN GRABLE, JACOBSON, AND
       RISEBORO........................................................ 23

       A. The Interpretation of Section 42(i)(7) Is
          Necessarily Raised By AMTAX's Claim Based
          on CohnReznick's Sham ROFR Calculation ................ 23

       B. The District Court's Correct Ruling That The
          Interpretation of Section 42(i)(7) Is Actually
          Disputed By The Parties Is Inconsistent With Its
          Reasoning Elsewhere ........................................ 30

       C. Differing Interpretations of Section 42(i)(7)
          Create Instability In The Federal LIHTC Market
          So The Proper Interpretation Is A Substantial
          Issue......................................................... 31

       D. The Exercise Of Jurisdiction Does Not Interfere
          With Congress' Judgment Regarding The
          Division Of Labor Between Federal And State
          Courts ....................................................... 34

CONCLUSION................................................................ 36

CERTIFICATE OF COMPLIANCE........................................... 38

CERTIFICATE OF SERVICE ................................................ 39

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*State ex rel. Am. Advisory Servs., LLC v. Egon Zehnder Int'l, Inc*.,
  592 F. Supp. 3d 183 (S.D.N.Y. 2022) .................................. 30, 33

*AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*,
  15 F.4th 551 (1st Cir. 2021) .......................................... 16, 32

*Ghartey v. St. John's Queens Hosp.*,
  869 F.2d 160 (2d Cir. 1989) ................................................ 23

*Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005) .......................................... 2, 6, 23, 36

*Gunn v. Minton*,
  568 U.S. 251 (2013) ...................................................... 35

*New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*,
  824 F.3d 308 (2d Cir. 2016) ........................................ *passim*

*Klein v. Aicher*,
  2020 WL 4194823 (S.D.N.Y. July. 21, 2020) ........................... 35

*Link Motion Inc. v. DLA Piper LLP*,
  103 F.4th 905 (2d Cir. 2024) ........................................ 31, 35

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................... 22

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ...................................................... 35

*Riseboro Community Inc. v. SunAmerica Housing Fund No. 682*,
  401 F.Supp.3d 367 (E.D.N.Y. 2019) ................................. *passim*

*Sharkey v. Quarantillo*,
  541 F.3d 75 (2d Cir. 2008) ........................................... 22, 29

*SM Kids, LLC v. Google LLC*,
  963 F.3d 206 (2d Cir. 2020) .............................................. 22

*Tantaros v. Fox News Network, LLC*,
  12 F.4th 135 (2d Cir. 2021) ...................................... 23, 24, 33

iv

PAGE(S)

*Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC*,
2020 WL 7646934 (D. Mass. Dec. 23, 2020), *aff'd on other grounds sub nom. AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551 (1st Cir. 2021) ........................................ 16

*Walsche v. First Invs. Corp.*,
981 F.2d 649 (2d Cir. 1992) ................................................. 23

*Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*,
215 F.3d 247 (2d Cir. 2000) ................................................. 29

**Statutes**

26 U.S.C. § 42 ("Section 42") ...................................1, 4, 9, 27, 32

26 U.S.C. § 42(i)(7) ("Section 42(i)(7)") .............................*passim*

28 U.S.C. § 1291 .......................................................... 1

28 U.S.C. § 1331 .......................................................... 1

28 U.S.C. § 1340 ............................................... 1, 33, 34, 36

Internal Revenue Code (the "Code") ................................... 1, 4, 24

Tax Reform Act of 1986 ....................................................... 9

**Rules**

Fed. R. Civ. P. § 12(b)(6) ...................................................... 6

**Regulations**

Treasury Regulations Section 1.704-2(b)(2) ................................. 11

## JURISDICTIONAL STATEMENT

## JURISDICTION OF THE DISTRICT COURT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1340 because the action raises necessary, disputed, and substantial issues relating to Section 42(i)(7) of the Internal Revenue Code (the "Code") and its interplay with other provisions of the Code and corresponding federal regulations that extend well beyond Section 42, including, but not limited to, Sections 1.704-2(b)(2) and 1.1001-2 of the Treasury Regulations.

## JURISDICTION OF THE SECOND CIRCUIT COURT OF APPEALS

This Court has jurisdiction because the Order on appeal, which dismissed the action in its entirety without prejudice, is a final order that is immediately appealable as of right pursuant to 28 U.S.C. § 1291. This appeal was timely filed. Appellant filed its notice of appeal on June 25, 2024 (App. 578) within 30 days of the June 4, 2024 dismissal order.

## STATEMENT OF THE ISSUES

1.  The issue on appeal is whether the District Court erred in applying the factors set forth in *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg*., 545 U.S. 308 (2005) and *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A*., 824 F.3d 308 (2d Cir. 2016) for the purposes of determining federal subject matter jurisdiction over state law claims where (1) the claims necessarily raised disputed issues concerning the proper interpretation of Section 42(i)(7) of the Code and related Code provisions and Treasury Regulations that are instrumental to the structure and functioning of federal tax law and the federal Low-Income Housing Tax Credit ("LIHTC") program; and (2) another District Court in this jurisdiction—Judge Dearie of the Eastern District of New York in *Riseboro Community Inc. v. SunAmerica Housing Fund No. 682*, 401 F.Supp.3d 367 (E.D.N.Y. 2019)—had previously found that subject matter jurisdiction existed in a case involving the interpretation of the exact same statutory provisions.

## STATEMENT OF RELATED CASES

This case has not been before this Court, but the following related lawsuits have been brought elsewhere:

- *Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC*, CA No. 2084CV01260-BLS1 (Mass. Super. Ct. 2020)

- *AMTAX Holdings 227, LLC v. Tenants' Dev. Corp*., No. 20 Civ. 10911 (D. Mass. May 12, 2020)

- *Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC*, No. 20 Civ. 10902 (LTS) (D. Mass. May 12, 2020)

## CONCISE STATEMENT OF THE CASE

This case centers on Appellee's contradictory interpretations of a provision of the Internal Revenue Code (the "Code") that relates to the federal low-income housing tax credit ("LIHTC") program codified at 26 U.S.C. § 42 ("Section 42") Appellant AMTAX Holdings 227, LLC is the investor limited partner of Tenants' Development II, LP (the "Partnership"), a Massachusetts limited partnership formed pursuant to Section 42 of the Code for the purpose of owning and operating a LIHTC housing development in Boston, Massachusetts (the "Property"). (App. 12, 14 – Compl. ¶¶ 9, 20.)[1] In exchange for an initial $12 million in capital to redevelop the Property, AMTAX received a 99.99% ownership stake in the Partnership as well as the corresponding right to federal tax benefits generated by the Property. (App. 14 – Compl. ¶ 22.) Appellee CohnReznick LLP ("CohnReznick") has served as the independent auditor and tax preparer for the Partnership since AMTAX entered the Partnership in 2003. (App. 21 – Compl. ¶ 49.)

As described below, CohnReznick consistently advised AMTAX and the Partnership's general partner, Tenants' Development II Corporation ("TD II"), that the relevant provisions of the Code and related Treasury Regulations should be interpreted in one manner over the course of their long relationship before abruptly

---

[1] Citations to "App." are to the Joint Appendix submitted contemporaneously herewith. Citations to "Compl." are to the complaint in this action.

abandoning its prior advice in performing a critical, concealed calculation of the amount AMTAX was entitled to receive under Section 42(i)(7) of the Code. AMTAX's breach of fiduciary duty and professional negligence claims are based on CohnReznick's contradictory interpretations of Section 42(i)(7) and related tax provisions and regulations, which had the foreseeable consequence of harming AMTAX. Those claims are thus inextricably tied to the proper interpretation of federal tax law that directly impacts the federal statutory framework for addressing the country's low-income housing needs.

## I. The District Court Analyzes AMTAX's Claims as Being Grounded in Contract

On February 9, 2023, AMTAX initiated this lawsuit asserting claims for breach of fiduciary duty, professional negligence, fraud, and unjust enrichment against CohnReznick. The claims were each premised on CohnReznick's years-long relationship with AMTAX and the advice it provided to AMTAX, in addition to its subsequent decision to betray AMTAX by generating the Sham ROFR Calculation, which violated of the statutory minimum price under Section 42(i)(7). (*See generally* App. 9 – Complaint.)

On June 4, 2024, the Honorable Judge Naomi Reice Buchwald granted that portion of CohnReznick's motion to dismiss seeking dismissal on the grounds of a lack of subject matter jurisdiction over AMTAX's claims (the "Decision"). In so ruling, the District Court applied the standard for finding subject matter jurisdiction

5

over state law claims involving federal issues set forth in *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) and *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308 (2d Cir. 2016). The District Court's dismissal was without prejudice, and it declined to rule on that portion of CohnReznick's motion made pursuant to Fed. R. Civ. P. 12(b)(6).

In its Decision, the District Court focused its analysis on the first and third prongs of the *Grable-Gunn* test relating to whether AMTAX's claims necessarily raised a substantial federal issue. Answering in the negative, the District Court repeatedly stated that AMTAX's claims were based on CohnReznick's interpretation of the ROR Agreement rather than its interpretation of the statutory minimum price under Section 42(i)(7). App. 565 – Decision at 25 ("AMTAX's argument that its claims rest on the interpretation of Section 42(i)(7), rather than the ROR Agreement, is too tenuous to support federal jurisdiction"). For example, the Court distinguished *Grable* as follows: "However, unlike in *Grable*, plaintiff's claims do not 'center[ ] on the action of a federal agency (IRS) and its compatibility with a federal statute,' but rather on a straightforward contract interpretation question triggered by a dispute between private litigants." App. 570 – Decision at 30 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)).

6

Likewise, the District Court contended that *Riseboro Community Inc. v. SunAmerica Housing Fund No. 682*, 401 F.Supp.3d 367 (E.D.N.Y. 2019) ("*Riseboro*") was inapplicable because "[b]y contrast [to that decision], AMTAX has failed to demonstrate that its claims depend on the interpretation of the Tax Code rather than the specific language of the ROR Agreement . . . ." App. 572 – Decision at 32.

In concluding that AMTAX's claims did not necessarily raise substantial issues of federal law, the District Court misconstrued the allegations in the complaint. The District Court recognized that AMTAX had alleged in detail that "its claims require the interpretation of Section 42(i)(7) and other related Internal Revenue Code (the 'Code') provisions . . . ." App. 564 – Decision at 24. The District Court also acknowledged that CohnReznick had argued that it owed no duty to AMTAX, not that AMTAX's claims were predicated on a contractual provision, and thus the Court was employing "slightly different reasoning" than CohnReznick. App. 565 – Decision at 25. The District Court's "reasoning" was that an email between TDC and CohnReznick that had been attached to the complaint to show that CohnReznick had performed the Sham ROFR Calculation supposedly demonstrated that the Calculation was based on an interpretation of the ROR Agreement rather than an interpretation of Section 42(i)(7). Instead of pointing to any specific language in that email, the District Court claimed the fact that "TDC's counsel

7

circulated the language of the ROR Agreement's purchase price provision while making no reference to Section 42(i)(7)" was sufficient for the Court to conclude that the Sham ROFR Calculation did not call for CohnReznick to interpret any provision of the Internal Revenue Code. App. 565 – Decision at 25; *see also* App. 566 – Decision at 26 (AMTAX could not demonstrate that "CohnReznick calculated the [Sham ROFR] price based on Section 42(i)(7) of the Code rather than the ROR Agreement" due to "the e-mail chain attached to its complaint").

In making this factual determination, the District Court failed to recognize that CohnReznick has previously *conceded* that the Sham ROFR Calculation was, in fact, based on its interpretation of Section 42(i)(7), *not* the ROR Agreement. (App. 34 – Compl. ¶¶ 104-07.) As detailed in the pleadings, once AMTAX learned that CohnReznick had performed the Sham ROFR Calculation, it objected in a letter. (App. 35 – Compl. ¶ 108.) In a November 2, 2022 response letter, CohnReznick's National Affordable Housing practice leader confirmed that CohnReznick's Sham ROFR Calculation purported to reflect "the minimum purchase price *as defined in Internal Revenue Code Section 42(i)(7),*" but failed to include payment of AMTAX's Exit Taxes. (App. 35 – Compl. ¶ 108 (emphasis added).)

In sum, the District Court's analysis turned entirely on a factual finding that it rendered based on the words of a lawyer for a non-party found in the middle of an email chain enclosed with the complaint for a different purpose, and that was

8

unequivocally contradicted by CohnReznick in contemporaneous written correspondence.

## II. The Federal LIHTC Program and Section 42 of the Code

Congress created the federal LIHTC program as part of the Tax Reform Act of 1986 to encourage private investment in affordable housing by providing federal tax credits to owners of affordable housing projects. (App. 15 – Compl. ¶¶ 24, 26.) Those tax credits are earned over a fifteen-year period referred to in the industry as the "compliance period." (App. 15 – Compl. ¶ 26.)

LIHTC tax credits may be used by bona fide "owners" of affordable housing properties and only in an amount proportional to such ownership. (App. 15 – Compl. ¶ 27.) As a result, LIHTC projects are typically structured as a limited partnership between one or more investor limited partners and one or more general partners, with the investor limited partners providing 99% or more of the necessary capital and holding a commensurate ownership stake in the LIHTC partnership. (App. 15 – Compl. ¶¶ 27-28.) Further, under the longstanding "economic substance" doctrine of tax law, an investor is deemed an owner for tax purposes—and thus eligible to receive tax credits and other tax benefits—only if the investment has economic substance, apart from the tax benefits, including upside potential and downside risk. (App. 16 – Compl. ¶ 29.)

Given the complicated nature of the LIHTC program and its treatment under the Code, LIHTC partnerships have heightened tax considerations as compared to a typical partnership. (App. 16 – Compl. ¶ 30.) Accordingly, specialized accountants, such as CohnReznick, play an outsized role in safeguarding the investor limited partner's tax benefits that are central to the proper functioning of the LIHTC program. (*Id.*)

This dispute focuses on a provision of the LIHTC program that was added by Congress in 1989, 26 U.S.C. § 42(i)(7) (hereinafter, "Section 42(i)(7)"). Section 42(i)(7) authorizes owners of LIHTC properties to grant certain eligible stakeholders a right of first refusal ("ROFR") that allows the holder of the ROFR, if certain conditions are satisfied, to buy the property after the compliance period for a statutory minimum price that is unrelated to the fair market value of the property. (App. 16 – Compl. ¶ 32.) Section 42(i)(7) describes the statutory minimum price as follows:

> The minimum purchase price under this subparagraph is an amount equal to the sum of –
>
> (i)     The principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale to the tenants), and
>
> (ii)     ***All federal, State, and local taxes attributable to such sale***. Except in the case of Federal income taxes, there shall not be taken into account under clause (ii) any additional tax attributable to the application of clause (ii).

10

(App. 17 – Compl. ¶ 33 (emphasis added).)  In other words, Section 42(i)(7) specifically includes taxes as part of the statutory minimum price.

The statutory minimum price was put in place to protect an investor limited partner's investment by ensuring that, upon a sale of a LIHTC partnership's primary asset pursuant to a Section 42(i)(7) ROFR, the investor limited partner would receive a minimum distribution equal to their tax liability—referred to colloquially in the LIHTC industry as "Exit Taxes"—and therefore be made whole from a tax perspective.  (App. 17 – Compl. ¶¶ 34-35.)  CohnReznick and various other industry participants have publicly confirmed that the  statutory minimum price under Section 42(i)(7) includes the investor limited partner's Exit Taxes.  (App. 17-19 – Compl. ¶¶ 36-42.)

A related federal tax concept is "Minimum Gain," which is the amount of gain necessary to bring a partner's negative capital account in a partnership to zero upon a disposition of partnership property.  (App. 19-20 – Compl. ¶¶ 43-45.)  Specifically, Section 1.704-2(b)(2) of the Treasury Regulations provides that, "[t]o the extent a nonrecourse liability exceeds the adjusted tax basis of the partnership property it encumbers, a disposition of that property will generate gain that at least equals that excess ('partnership minimum gain')."  This is called Minimum Gain because it will be the minimum amount of gain realized upon a sale of the property *irrespective of the purchase price*.  (App. 20 – Compl. ¶ 46.)  Minimum Gain is relevant to Section

42(i)(7) because, as explained below, for many years CohnReznick relied on the conventional interpretation of the statutory minimum price under Section 42(i)(7)— *i.e.*, that it includes the investor limited partner's Exit Taxes—in attesting to AMTAX and the IRS that there was adequate Minimum Gain to support AMTAX's negative capital account.

### III. CohnReznick Consistently Confirms the Accepted Interpretation of Section 42(i)(7)

Over the course of two decades as the Partnership's independent auditor and tax preparer, CohnReznick repeatedly and consistently confirmed by its actions that the traditional interpretation of the statutory minimum price under Section 42(i)(7) was correct. To begin with, in performing the Minimum Gain calculations described above, CohnReznick utilized a methodology that assumed that AMTAX's Exit Taxes would be included in the statutory minimum price upon any exercise of a Section 42(i)(7) ROFR. (App. 26-28 – Compl. ¶¶ 69-76.) Indeed, CohnReznick certified annually to the IRS that any sale of the Property—which would include a sale for the statutory minimum price under Section 42(i)(7)—would generate sufficient taxable gain to offset the deficiency in AMTAX's capital account, thereby satisfying the Minimum Gain requirements for AMTAX's negative capital account. (App. 10, 21 – Compl. ¶¶ 4, 50.)

Additionally, CohnReznick was asked several times to prepare a calculation of taxes that AMTAX would incur upon a sale of the Property, including in

connection with a sale under Section 42(i)(7) (the "Exit Tax Calculations"). (App. 23 – Compl. ¶ 57.) In response, CohnReznick ran a series of pro forma putative Exit Tax Calculations for AMTAX to review and evaluate reflecting AMTAX's tax liability relating to the Minimum Gain on sale. (*Id.*) These Exit Tax Calculations were critically important because they amounted to a culmination of all the tax work CohnReznick had performed since 2003, and were necessary to ensure that the tax benefits AMTAX had received over the life of the Partnership would not be compromised. (*Id.*)

In particular, CohnReznick performed three pro forma Exit Tax Calculations: in 2017, 2018, and 2019. (App. 23 – Compl. ¶ 60.) Each of these Exit Tax Calculations accurately reflected that AMTAX would receive a gain upon a sale of the Property in an amount equal to its negative capital account balance, which would result in Exit Taxes to AMTAX totaling millions of dollars. (App. 26 – Compl. ¶ 69.) Moreover, a CohnReznick partner sent an email to the Partnership's general partner in connection with the 2019 Exit Tax Calculation in which he affirmatively acknowledged that the Exit Taxes were "the payment due to the Investor when the [Section 42(i)(7) ROFR] is exercised," while another CohnReznick employee similarly confirmed that the Exit Taxes represented the amount "that needs to be paid to [AMTAX] in cash" under Section 42(i)(7). (App. 27 – Compl. ¶ 74.)

13

## IV. CohnReznick Turns on AMTAX By Performing a Secret Minimum Price Calculation Using a Contrived and Contradictory Interpretation of Section 42(i)(7)

In September 2019, TD II espoused a strategy to force AMTAX out of the Partnership without paying AMTAX a sum sufficient to cover its Exit Taxes. (App. 28 – Compl. ¶ 79.) In furtherance of this strategy, CohnReznick and TD II entered into a secret side engagement agreement in January 2020 pursuant to which CohnReznick agreed to provide the Partnership a Section 42(i)(7) price calculation that excluded AMTAX's projected Exit Taxes upon a sale of the Property. (App. 28 – Compl. ¶ 80.) CohnReznick's new approach was directly at odds with CohnReznick's prior Exit Tax Calculations and Minimum Gain analyses, and was inconsistent with CohnReznick's public pronouncements regarding how to properly perform a Section 42(i)(7) ROFR price calculation. (App. 18-19 – Compl. ¶¶ 39-42.)

The secret engagement ultimately yielded a "Right of First Refusal Calculation" that did not include any amounts attributable to AMTAX's Exit Taxes (the "Sham ROFR Calculation"), which CohnReznick provided to TD II on February 7, 2020. (App. 30 – Compl. ¶ 85.) AMTAX was unaware that CohnReznick had performed the Sham ROFR Calculation until discovery revealed that fact in a separate lawsuit. (App. 30 – Compl. ¶ 86.)

14

As was foreseeable by CohnReznick, the Sham ROFR Calculation was ultimately weaponized against AMTAX in an attempt to force a sale of the Property to TD II's corporate parent—Tenants' Development Corporation ("TDC")—for an amount that did not include AMTAX's Exit Taxes (and thus did not comport with the statutory minimum price under Section 42(i)(7). (App. 32-33 – Compl. ¶¶ 94-99.) As a result, AMTAX was forced to engage in a prolonged and costly legal dispute that would have been unnecessary had CohnReznick simply complied with its fiduciary and professional obligations.

### V. The Massachusetts Breach of Contract Actions

On May 12, 2020, TD II and TDC brought an action against AMTAX in federal court seeking a declaratory judgment that TDC's ROFR under a Right of Refusal and Purchase Option Agreement (the "ROR Agreement") was validly triggered and exercised at the statutory minimum price calculated by CohnReznick. *Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC*, No. 20 Civ. 10902 (LTS) (D. Mass. May 12, 2020), ECF No. 1 ¶¶ 112-13, 151. That same day, AMTAX brought a separate federal action against TD II and TDC seeking a competing declaration that the ROFR in the ROR Agreement was void in addition to other contract and tort claims pleaded in the alternative. *AMTAX Holdings 227, LLC v. Tenants' Dev. Corp.*, No. 20 Civ. 10911 (D. Mass. May 12, 2020), ECF No. 1 (the "Federal Massachusetts Action"). CohnReznick was not named in either action.

15

Both actions were ultimately dismissed for lack of subject matter jurisdiction on December 23, 2020. *Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC*, 2020 WL 7646934, at \*1 (D. Mass. Dec. 23, 2020), *aff'd on other grounds sub nom*. *AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp*., 15 F.4th 551 (1st Cir. 2021). In affirming dismissal of the action brought by AMTAX, the First Circuit ruled there was no federal subject matter jurisdiction because AMTAX's claim against TD II and TDC, "[r]efined to it bare essence, [was] a dispute over a contract, the [ROR] Agreement," and not a dispute over the proper interpretation of Section 42(i)(7). *See AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 557-58 (1st Cir. 2021). Significantly for this action, however, the First Circuit found that the parties had not argued whether a breach of contract theory based on the endangerment of federal tax benefits would support a finding of subject matter jurisdiction, and therefore declined to consider the issue. *See id.* 558-59 ("It may or may not be that this breach of contract theory would necessarily implicate the proper interpretation of section 42(i)(7) and would present a substantial issue of relevance to other cases. But that question is not properly before us, and we need not answer it.").

Subsequently, TDC initiated a substantially identical lawsuit in Massachusetts state court on July 17, 2020. *See Tenants Dev. Corp. v. AMTAX Holdings 227, LLC*, CA No. 2084CV01260-BLS1 (Mass. Super. Ct. 2020) (the "State Action" and, together with the Federal Massachusetts Action, the "Massachusetts Actions").

16

TDC's primary cause of action in the State Action was a purely contractual claim seeking a declaration that the contractual ROFR was validly triggered and that the purchase price asserted by TDC was consistent with the ROR Agreement. AMTAX, in turn, asserted several counterclaims that challenged both the validity of the purported ROFR exercise and the calculation of the ROFR price under the ROR Agreement. State Action, Doc. No. 17, ¶¶ 150(h), 153-59. As with the Federal Massachusetts Action, CohnReznick was not a party to the State Action.

On June 30, 2023, the Massachusetts Superior Court ruled on the parties' cross-motions for summary judgment. State Action, Doc. No. 62. Among other things, the state court ruled that (1) AMTAX's consent was not required for a sale of the Property under the ROR Agreement, and (2) contrary to CohnReznick's Sham ROFR Calculation—but consistent with its prior public and private statements—the purchase price under the ROR Agreement needed to include AMTAX's Exit Taxes.

## SUMMARY OF THE ARGUMENT

Where a plaintiff brings state law claims requiring resolution of federal issues, as AMTAX does here, federal courts apply the so-called *Grable-Gunn* test to determine if subject matter jurisdiction exists.  AMTAX's claims satisfy the *Grable-Gunn* test because they are inextricably intertwined with the proper meaning of a significant provision of federal law.  *First*, each of AMTAX's claims necessarily requires interpretation of Section 42(i)(7) and related Code provisions and Treasury Regulations to determine whether CohnReznick breached its professional and fiduciary duties to AMTAX.  *Second*, as CohnReznick did not contest and the District Court acknowledged, the parties actually dispute the meaning of Section 42(i)(7).  *Third*, the interpretation of Section 42(i)(7) and its interplay with other Code provisions and Treasury Regulations raises substantial issues relating to the federal LIHTC program specifically and federal tax law principles more generally.  And, *lastly*, caselaw in this Circuit has held that federal jurisdiction over Section 42(i)(7) cases—rare as they are—would not disturb the federal-state balance.

The Eastern District of New York specifically addressed AMTAX's subject matter jurisdiction theory in *Riseboro*.  As in this matter, the parties disputed the correct interpretation of Section 42(i)(7) in the context of state law claims, and Judge Dearie held that dispute created a substantial federal question:

> "While it is true that the language of this specific ROFR may be unique to the parties' Restated Agreement, the Court's ultimate determination

18

would not be based on the specific language of the ROFR but rather on its interpretation of Congress' intent in drafting 26 U.S.C. § 42(i)(7). ***The correct construction of 26 U.S.C. § 42(i)(7) . . . is a purely legal question that is substantial and will be applicable to many other LIHTC agreements nationwide that provide for a ROFR under 26 U.S.C. § 42(i)(7).***"

*Riseboro Community Inc. v. SunAmerica Housing Fund No. 682*, 401 F.Supp.3d 367, 374 (E.D.N.Y. 2019) (emphasis added). As in *Riseboro*, the court in this case will need to address pure legal questions regarding the proper interpretation of federal tax law that are substantial and will be applicable to any other LIHTC agreement that provides for a ROFR at the statutory minimum price under Section 42(i)(7).

Below, the District Court dismissed the action for lack of subject matter jurisdiction because it misunderstood or misinterpreted the factual and legal bases for AMTAX's claims and, as a result, followed the First Circuit's inapposite decision in the Massachusetts Federal Action instead of Judge Dearie's well-reasoned analysis in *Riseboro*. That was error. The First Circuit specifically declined to consider in the Massachusetts Federal Action the very question presented on this appeal—*i.e.*, whether federal question jurisdiction exists where, as here, the claims required the interpretation of federal tax law. Unlike the Massachusetts Federal Action, which was, at its essence, a *contract* case, this is an *accounting liability* case based on CohnReznick's breaches of its fiduciary and professional obligations in performing a calculation that was supposed to be—but was not—consistent with

federal tax law, and where liability is predicated, in substantial part, on the very issue left unaddressed by the First Circuit.

Nevertheless, the District Court relied on the words in an email (by a lawyer for a non-party) in deciding to treat this case as a contractual dispute related to the interpretation of the ROR Agreement. Given that the District Court's gloss on the email was contradicted by CohnReznick itself—which confirmed in a letter to AMTAX that the Sham ROFR Calculation was based on CohnReznick's interpretation of Section 42(i)(7)—this Court should reverse the Decision and remand the case to the District Court for further proceedings.

Even in the absence of that factual error, the District Court erred as a matter of law because each of AMTAX's claims require interpretation of Section 42(i)(7). It is immaterial whether CohnReznick was technically hired to perform a calculation pursuant to a contractual provision or some other reason; the predicate for AMTAX's claims is that CohnReznick willfully agreed to perform the Sham ROFR Calculation in a way that is *fundamentally inconsistent with Section 42(i)(7)*. CohnReznick also knew that TDC intended to use the Sham ROFR Calculation to deprive AMTAX of tax benefits due to AMTAX as a LIHTC investor, yet proceeded to play its part in the scheme anyway. Simply put, a fiduciary and professional accounting firm that holds itself out as a LIHTC expert cannot agree to perform a calculation that it knows is at odds with federal tax law (and its own advice on such

law) and that could cost the 99.99% owner of its client millions in taxes without subjecting itself to liability.

Properly considered, AMTAX's claims satisfy the *Grable-Gunn* test for subject matter jurisdiction, requiring reversal.

## ARGUMENT

### I. STANDARD OF REVIEW ON APPEAL

This Court reviews decisions regarding federal subject matter jurisdiction *de novo*. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).

"At the pleading stage, general factual allegations . . . may suffice [to establish jurisdiction]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 556 (1992). Further, "[a] district court has discretion to hold a hearing to resolve factual disputes that bear on the court's jurisdiction, but where, as here, the case is at the pleading stage and no evidentiary hearings have been held, '[i]n reviewing the grant of a motion to dismiss [under Rule 12(b)(1)] [a court] *must accept as true all material facts alleged in the complaint* and draw all reasonable inferences in the plaintiffs favor.'" *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (emphasis added) quoting *Merritt v. Shuttle, Inc.,* 245 F.3d 182, 186 (2d Cir. 2001).

As explained below, the District Court erred in refusing to find the existence of federal question jurisdiction even though AMTAX's well-pleaded state law claims are predicated on substantial questions of federal law. AMTAX respectfully submits that the Decision should therefore be reversed and the case remanded to the District Court for further proceedings.[2]

---

[2] The non-jurisdictional arguments raised by CohnReznick that the District Court declined to consider should be decided by the District Court in the first instance

## II. THE DECISION IMPROPERLY APPLIED THE STANDARDS FOR SUBJECT MATTER JURISDICTION SET FORTH IN *GRABLE*, *JACOBSON*, AND *RISEBORO*

As the claims in this action are state law claims invoking a federal issue, the so-called *Grable-Gunn* test provides the applicable framework:

> Federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.

*Jacobson*, 824 F.3d 308 at 315 (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)).

Federal jurisdiction is based on the "'commonsense notion that a federal court ought to be able to hear' state law claims that 'turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues.'" *Tantaros v. Fox News Network, LLC*, 12 F.4th 135, 140 (2d Cir. 2021) (quoting *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 312 (2005)).

### A. The Interpretation of Section 42(i)(7) Is Necessarily Raised By AMTAX's Claim Based on CohnReznick's Sham ROFR Calculation

The first element of the *Grable-Gunn* test requires that the federal question be necessarily raised. "A state-law claim 'necessarily' raises federal questions where

_____

following a remand by this Court. *See Walsche v. First Invs. Corp.*, 981 F.2d 649, 655 (2d Cir. 1992) (declining to consider alternative grounds for dismissal that should be "properly left to the district court as a matter of first instance"); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 167 (2d Cir. 1989) (same).

the claim is affirmatively 'premised' on a violation of federal law." *Jacobson*, 824 F.3d at 315 (quoting *Grable*, 545 U.S. at 314). The Second Circuit has previously held that a court may only exercise jurisdiction under the *Grable-Gunn* test "if a right or immunity created by the Constitution or laws of the United States is an element, and an essential one, of the plaintiff's cause of action." *Tantaros*, 12 F.4th at 141. AMTAX clears that bar because its claims are premised on advice that CohnReznick gave relating to the meaning of a provision of the Code concerning federal LIHTC tax benefits.

AMTAX's first claim is for breach of fiduciary duty. (App. 36-37 – Compl. ¶¶ 112-21.) AMTAX alleges that CohnReznick was duty-bound in the work it contracted to perform for the Partnership to avoid taking positions that (1) conflicted with the methodology CohnReznick used in performing Minimum Gain calculations and prior Exit Tax Calculations; (2) jeopardized the tax attributes of the Partnership; and (3) deliberately sought to prevent AMTAX from receiving all the tax benefits and other benefits CohnReznick had, in substance, represented that AMTAX would receive over the past two decades. (*Id.*) As such, a court cannot decide whether CohnReznick breached its obligations to AMTAX without analyzing both if CohnReznick performed the Sham ROFR Calculation in accordance with the statutory requirements of Section 42(i)(7) and if CohnReznick's decades-long tax advice and calculations were consistent with federal law. That requires

interpretation and application of Section 42(i)(7) itself—not a private contractual ROFR.

The same is true of AMTAX's second claim for professional negligence. Determining whether CohnReznick breached its duty to protect AMTAX's tax benefits requires a similar analysis: whether those benefits were imperiled by CohnReznick's performance of the Sham ROFR Calculation to generate a price below the statutory minimum price imposed by Section 42(i)(7), and whether the Sham ROFR Calculation was inconsistent with the tax advice CohnReznick had provided to AMTAX and that AMTAX had, in turn, relied upon. (App. 38 – Compl. ¶¶ 126-27.)

With respect to its third cause of action for fraud, AMTAX alleges that CohnReznick affirmatively misrepresented that it would "provide impartial and independent advice to protect AMTAX's tax status." (App. 40 – Compl. ¶ 139.) Whether that alleged misrepresentation was false depends on whether CohnReznick provided misleading advice on federal tax law for the two decades prior to the Sham ROFR Calculation or in connection with the Sham ROFR Calculation itself. In either case, AMTAX's contention is that CohnReznick intentionally miscalculated the statutory minimum price in violation of Section 42(i)(7), and an interpretation of federal tax law is required to determine whether the relevant statement was false.

25

And, lastly, AMTAX's claim for unjust enrichment alleges that it would be unjust for CohnReznick to retain benefits received from the partnership after "jeopardizing the tax attributes of the Partnership." (App. 41 – Compl. ¶ 145.) Once again, consideration of this claim requires consideration of whether the Partnership's tax status and AMTAX's federal tax benefits were jeopardized by CohnReznick agreeing to conduct a calculation that violated Section 42(i)(7) after decades of providing contradictory tax advice.

Each of these claims requires an interpretation of Section 42(i)(7) and how the statutory minimum price thereunder should be calculated, which is a pure issue of federal law. Moreover, AMTAX's claims will require discovery into and analysis of the federal tax advice that CohnReznick provided to AMTAX for decades and the representations that CohnReznick made to the IRS about AMTAX's negative capital account balance. (App. 10, 21 – Compl. ¶¶ 4, 50.) These related issues are an additional reason that federal law is at the center of this dispute.

Notably, the issues here are much further removed from contractual interpretation than those considered in *Riseboro*. In that case, the plaintiffs brought purely contractual claims seeking "specific performance and damages for Defendants' alleged breach of the [ROFR] Agreement" and "declaratory judgments pertaining to its right to exercise its ROFR." *Riseboro Community Inc. v. SunAmerica Housing Fund No. 682*, 401 F.Supp.3d 367, 371 (E.D.N.Y. 2019).

Those claims track much more closely to the contractual claims addressed in the Massachusetts Actions which likewise concerned declaratory relief. And yet, Judge Dearie found the claims in *Riseboro* necessarily raised an actually disputed, substantial federal issue under the *Grable-Gunn* test. *Id*. at 372-73. In so holding, Judge Dearie reviewed Section 42(i)(7) cases in other jurisdictions, and determined that the plaintiff's claims required resolution of the following issues:

> "(1) whether 26 U.S.C. § 42 contemplates any restrictions on an ROFR holder's ability to exercise it, and (2) whether 26 U.S.C. § 42(i)(7) envisions an ROFR that differs from a common law ROFR."

*Id*. at 373. Judge Dearie went on to clarify that the parties' rights and obligations under the ROFR Agreement "and whether Defendants breached those obligations requires the Court to do more than engage in contract interpretation." *Id*.

In effect, Judge Dearie found subject matter jurisdiction adequately alleged because the plaintiff's claims necessarily required interpretation of both statutory and contractual requirements. As Judge Dearie explained it, "the existence or non-existence of any conditions precedent for Plaintiff to exercise its ROFR is mandated by 26 U.S.C. § 42, making Plaintiff's claims 'predicated on ... violations of obligations rooted exclusively in federal law.'" *Id*. (quoting *Varga v. McGraw Hill Fin., Inc.*, 36 F. Supp. 3d 377, 382 (S.D.N.Y. 2014)). Here, by contrast, the issues raised by AMTAX's claims require *only statutory interpretation*, meaning questions

27

of federal law are even more pronounced. The analysis in *Riseboro* therefore strongly supports the existence of federal question jurisdiction here.

Likewise, AMTAX's claims parallel the circumstances in *Jacobson*, which involved a bank's alleged misrepresentations about the tax status of certain trusts. As in that matter, AMTAX's claims largely "predicate[] liability" on CohnReznick's statements and omissions about the Partnership's tax status—i.e., the Minimum Gain and Section 42(i)(7) price calculations it performed. *New York ex rel. Jacobson v. Wells Fargo National Bank, N.A.*, 824 F.3d 308, 317 (2d Cir. 2016). Thus, to find CohnReznick liable for the misconduct alleged in the complaint, AMTAX "must prove" the proper meaning of Section 42(i)(7) and address the significance of CohnReznick's Minimum Gain calculations on related federal tax principles. *Id*.

While the District Court credited the legal analyses in *Riseboro* and *Jacobson*, it mistakenly discounted the factual similarities. That was error for two reasons.

*First*, the District Court distinguished those cases by assuming the role of factfinder at the motion to dismiss stage to make a finding that an aside by a lawyer in a multi-page email containing discussions of complicated issues of federal tax law somehow rebutted AMTAX's own articulation of its claims. App. 565, 572-73 – Decision at 25, 32-33. The District Court made this factual finding even though CohnReznick specifically conceded in a letter sent to AMTAX that the Sham ROFR Calculation was intended to reflect "the minimum purchase price *as defined in*

28

*Internal Revenue Code Section 42(i)(7) . . . .*" (App. 35 – Compl. ¶ 108) (emphasis added). At a minimum, the District Court was required to hold an evidentiary hearing on the issue of whether CohnReznick's Sham ROFR Calculation purported to apply Section 42(i)(7) of the federal tax code (as CohnReznick itself has conceded) or instead was offering a legal opinion regarding the meaning of a contract. *See Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (at the motion to dismiss stage, where no evidentiary hearing has been held, the allegations in the complaint must be accepted as true); *cf. Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (finding no abuse of discretion for a failure to hold an evidentiary hearing where the court "afforded the parties two years of discovery solely on the jurisdictional issue").

*Second*, the District Court erred in attaching undue weight to the email. Even if CohnReznick was technically asked to conduct a calculation pursuant to the ROR Agreement, CohnReznick still knew that it was performing, in effect, a calculation of the statutory minimum price under Section 42(i)(7) of the Code. Indeed, AMTAX's claims stem from the fact that CohnReznick could not willfully disregard the requirements of Section 42(i)(7) and its obligations to AMTAX in carrying out the Sham ROFR Calculation.

In short, contrary to the District Court's premature and erroneous factual determination, each of AMTAX's claims seek to impose liability upon CohnReznick

for performing a calculation that violated Section 42(i)(7) and endangering AMTAX's federal tax benefits through its improper interpretation of the Code. Resolution of those claims necessarily requires interpretation and application of federal tax law. The District Court misunderstood this logical sequence and instead treated AMTAX's claims as if they turned solely on principles of contractual interpretation. That misunderstanding caused the District Court to find that no federal issue was necessarily raised, and that finding was error.

### B. The District Court's Correct Ruling That The Interpretation of Section 42(i)(7) Is Actually Disputed By The Parties Is Inconsistent With Its Reasoning Elsewhere

The District Court correctly held that the second element of the *Grable-Gunn* test—*i.e.*, whether the federal issue is actually disputed—is satisfied because "the parties dispute the meaning of Section 42(i)(7) and whether CohnReznick acted in accordance with the statute." App. 15 – Decision at 27. The federal issue is "actually disputed" here because AMTAX's theory of liability involves a construction of Section 42(i)(7) that CohnReznick disputes. *See, e.g.*, *State ex rel. Am. Advisory Servs., LLC v. Egon Zehnder Int'l, Inc.*, 592 F. Supp. 3d 183, 208 (S.D.N.Y. 2022) (finding a federal tax issue was "actually disputed" where plaintiff's claim rested on an interpretation of federal law that "Defendants necessarily dispute"). While the District Court correctly ruled on this element, the District Court's admission that it "does not doubt that the parties dispute . . . whether CohnReznick acted in

accordance with [Section 42(i)(7)]" is logically irreconcilable with its holding that the interpretation and application of Section 42(i)(7) is not necessarily raised by AMTAX's claims. This is another reason why the District Court holding was made in error.

### C. Differing Interpretations of Section 42(i)(7) Create Instability In The Federal LIHTC Market So The Proper Interpretation Is A Substantial Issue

As discussed above, AMTAX's claims raise a pure issue of federal law relating to the meaning of Section 42(i)(7). Leaving this issue to the state courts risks inconsistent, erroneous interpretations of provisions of the Internal Revenue Code that private investors rely upon when fronting low-income housing development costs 20-years prior to being made whole. That inconsistency would have a chilling effect that is directly at odds with the purpose of the federal LIHTC program and, therefore, resolution of the issues raised by AMTAX's claims are significant "to the federal system as a whole." *Jacobson*, 824 F.3d at 316 (quoting *Gunn v. Minton*, 568 U.S. 251, 260 (2013)). That broad impact makes this case distinguishable from those where the only impact from a misapplication of federal law would be on the individual litigants. *See, e.g.*, *Link Motion Inc. v. DLA Piper LLP*, 103 F.4th 905, 915 (2d Cir. 2024) ("At most, a ruling favorable to [plaintiff] would shift certain costs in [a separate lawsuit] from client to attorney.").

31

Indeed, the LIHTC program was created to "encourage[] private investment in affordable housing by providing federal tax credits to owners of affordable housing projects that comply with . . . requirements set forth in Section 42." (App. 15 – Compl. ¶ 26.) The statutory minimum price under Section 42(i)(7) was, in turn, created to protect those incentives "by ensuring that, upon a sale of a LIHTC partnership's primary asset pursuant to a Section 42(i)(7) ROFR, the investor limited partner would . . . be made whole from a tax perspective." (App. 17 – Compl. ¶ 34.) And the safe harbor created by Section 42(i)(7) is "attractive from an investor's coign of vantage" because it avoids application of the general rule that would otherwise "preclude an owner whose interest is subject to such a [below-market ROFR] from claiming any tax benefits associated with the asset." *AMTAX Holdings 227, LLC v. Tenants' Dev. II. Corp.*, 15 F.4th 551, 554 (1st Cir. 2021). Congress thus viewed Section 42(i)(7) as a key element in ensuring the viability of the LIHTC program because it ensures the program's appeal to private investment. Because more uncertainty means less investment, it follows that uncertainty surrounding the statutory minimum price under Section 42(i)(7) is counterproductive to Section 42's legislative purpose and the LIHTC program's proper functioning.

Finding these pure issues of tax law to be substantial for purposes of the *Grable-Gunn* test would be consistent with other decisions considering the federal interest in the proper interpretation of federal tax law. Specifically, "[t]he Supreme

32

Court and [the Second Circuit] have found a significant federal interest in the interpretation of a federal law, such as in disputes over the meaning of a federal tax law [and] the scope of an Internal Revenue Code regulation." *Tantaros v. Fox News Network, LLC*, 12 F.4th 135, 145 (2d Cir. 2021); *see also State ex rel. Am. Advisory Servs., LLC v. Egon Zehnder Int'l, Inc*., 592 F. Supp. 3d 183, 208 (S.D.N.Y. 2022) ("The exercise of federal jurisdiction to determine international tax issues under the [Code] embedded in a state tax claim appears to be consistent with congressional judgment."). In fact, 28 U.S.C. § 1340 demonstrates that Congress intended disputes involving federal tax statutes to be heard in federal courts, and provides an independent basis for federal jurisdiction over AMTAX's claims. *See Riseboro Community Inc. v. SunAmerica Housing Fund No*. *682*, 401 F.Supp.3d 367, 375 (E.D.N.Y. 2019).[3]

Moreover, the Eastern District of New York has already determined that "the correct construction of 26 U.S.C. § 42(i)(7) and how it differs from a common law ROFR is a purely legal question that is substantial and will be applicable to many other LIHTC agreements nationwide." *Riseboro*, 401 F.Supp.3d at 374. Judge

---

[3] Section 1340 provides federal district courts with original jurisdiction over "any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade." 28 U.S.C. § 1340. The Eastern District of New York found, as should this Court, that 28 U.S.C. § 1340 codified Congress' intent to resolve disputes involving federal tax statutes in federal courts. *Riseboro*, 401 F.Supp.3d at 375.

Dearie helpfully illustrated the need to resolve those issues by collecting cases in other jurisdictions that yielded differing and irreconcilable applications of Section 42(i)(7). *Id*. at 374.

For its part, the District Court's holding that the federal issues raised by AMTAX's claims fail the third *Grable-Gunn* element of substantiality flowed from its misunderstanding that AMTAX's claims in this action turn only on the construction of a private contract. *See* App. 569 – Decision at 29 ("AMTAX's argument is unpersuasive, as its state-law claims ultimately rest on the interpretation of the ROR Agreement's purchase price provision, not federal tax law."). However, as previously set forth, AMTAX's claims are *not* grounded in any contract.

### D. The Exercise Of Jurisdiction Does Not Interfere With Congress' Judgment Regarding The Division Of Labor Between Federal And State Courts

As the Eastern District of New York stated in *Riseboro*, "federal jurisdiction over this case will not trigger a voluminous amount of cases or transform state court litigation of traditional breach of contract actions involving ROFR provisions into federal litigation because 'it is a rare such action that hinges on the proper interpretation' of an admittedly unique ROFR under federal tax law." *Riseboro*, 401 F.Supp.3d at 376 (quoting *Jacobson*, 824 F.3d at 318). Further, as discussed above (*supra* at 32, n.3), Congress's enactment of 28 U.S.C. § 1340 was an unambiguous

expression of its desire for disputes concerning federal tax law to be heard in federal court.

The District Court largely brushed aside this LIHTC-specific statement of law and, instead, articulated its hesitancy to invite state malpractice claims to be brought in federal court. App. 574-76 – Decision at 34-36. But in doing so, the District Court neglected to cite *a single case* analyzing accountant malpractice claims under the *Grable-Gunn* test.[4] The legal malpractice cases relied on by the District Court are distinguishable because such claims typically arise under state law and thus are the "sort of claims ordinarily resolved in state courts." *Link Motion Inc. v. DLA Piper LLP*, 103 F.4th 905, 916 (2d Cir. 2024). There is no comparable state interest in regulating accountants or auditors (who are not members of state bars), or even any history of litigating claims against them in a particular forum. It is also significant that the accountants at issue in this action are self-proclaimed specialists in federal low-income housing tax law; they are not conventional tax accountants

---

[4] *See Gunn v. Minton*, 568 U.S. 251 (2013) (holding narrowly that "state legal malpractice claims based on underlying patent matters will rarely, if ever" confer jurisdiction); *Klein v. Aicher*, 2020 WL 4194823 (S.D.N.Y. July 21, 2020) (analyzing a legal malpractice case and dismissing, in part, due to issues related to the attorney-client relationship). Although the District Court also cited a non-jurisdictional decision related to abortion clinics, it is unclear why such an authority would be relevant. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) (analyzing speech restrictions imposed upon licensed clinics in the context of determining whether to treat so-called "professional speech" differently under the First Amendment).

preparing individual tax returns. As Judge Dearie noted in *Riseboro*, a Section 42(i)(7) ROFR dispute is a relatively rare occurrence—so too are accountants specializing in Section 42(i)(7). Accordingly, jurisdiction here would not open the floodgates to federal courts deciding accountant liability cases in general.

In any event, the jurisdictional legislation contained in 28 U.S.C. § 1340 is undoubtedly a clearer expression of congressional intent than is any stray dicta concerning states' interest in regulating accountants. This policy makes sense because diverging interpretations of federal tax law at the state level could lead to forum shopping or disproportionate LIHTC investments across states.

Lastly, the District Court cited the presence of LIHTC state agencies as another factor militating against federal jurisdiction. App. 576 – Decision at 36. This mistakes the standard. The Supreme Court in *Grable* sought to protect "congressional judgment about the sound division of labor between *state and federal courts* governing the application of § 1331." *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005) (emphasis added). The power of state agencies has no relevance to the division of labor between state and federal courts.

## CONCLUSION

For the foregoing reasons, the Decision should be reversed, and the action remanded to the District Court.

36

Dated:   August 21, 2024

Respectfully submitted,

GLENN AGRE BERGMAN & FUENTES LLP

By:  */s/ L. Reid Skibell*
L. Reid Skibell, Esq.
   Rskibell@glennagre.com
Olga Lucia Fuentes Skinner, Esq.
   Ofuentes@glennagre.com
Avelino A. Garcia, Esq.
   Agarcia@glennagre.com
1185 Avenue of the Americas, 22nd Floor
New York, NY 10037
(212) 970-1600

*Attorneys for AMTAX Holdings 227, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the length limits requirements of Local Rule 32.1(a)(4) because this brief contains 7,931 words, excluding the parts of the document excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated: August 21, 2024            Respectfully submitted,

                           */s/ L. Reid Skibell*
                           L. Reid Skibell

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was electronically filed and served on the other party on August 21, 2024 using the Court's ECF system. I further certify that counsel for Appellant has also delivered an electronic copy of the foregoing to counsel for Appellee.

Dated: August 21, 2024

*/s/ L. Reid Skibell*

L. Reid Skibell

SPECIAL APPENDIX

**TABLE OF CONTENTS**

PAGE

Memorandum and Order of the Honorable Naomi Reice Buchwald,
 filed June 4, 2024 (Dkt. 50) ..................................... SPA-1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X
AMTAX HOLDINGS 227, LLC,

                Plaintiff,                      MEMORANDUM AND ORDER

            - against –                          23 Civ. 1124  (NRB)

COHNREZNICK LLP,

                Defendant.

-----------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff AMTAX Holdings 227, LLC ("AMTAX," the "Limited Partner," or "plaintiff") filed this lawsuit on February 9, 2023 asserting claims of breach of fiduciary duty, professional negligence, unjust enrichment, and fraud against CohnReznick LLP ("CohnReznick" or "defendant"). Presently before the Court is defendant's motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 33. Also pending before the Court is nonparty Tenants' Development Corporation's (the "Nonprofit" or "TDC") motion to intervene and dismiss pursuant to Federal Rules of Civil Procedure 24, 12(b)(1), and 12(b)(6). ECF No. 35. For the following reasons, defendant's motion is granted and the complaint is dismissed for lack of subject matter jurisdiction. Consequently, the Court does not need to reach the motion to intervene.

**BACKGROUND**[1]

Plaintiff's claims stem from its investment in a limited partnership that owned a low-income housing property located in Boston, Massachusetts (the "Property").  The limited partnership owned the Property pursuant to the Low-Income Housing Tax Credit ("LIHTC") program in order to take advantage of certain tax benefits.  Before addressing the specific facts of this case, it is helpful at the outset to provide some background regarding the LIHTC program.

**A.    The LIHTC Program**

Congress created the LIHTC program pursuant to the Tax Reform Act of 1986 as an incentive to private investors to finance the development of affordable housing through the distribution of tax credits.  See generally Mark P. Keightley, CONG. RSCH. SERV., RS22389, An Introduction to the Low-Income Housing Tax Credit (2023).  Through the LIHTC program, the Internal Revenue Service ("IRS") allocates federal tax credits annually to state housing agencies, which then award the tax credits to eligible developers

_____

[1] The facts considered and recited here are drawn from plaintiff's complaint and any attachments thereto, and are accepted as true for purposes of the instant motion.  See Doe v. City of New York, No. 19 Civ. 9338 (AT), 2021 WL 964818, at *1 (S.D.N.Y. Mar. 15, 2021).  The Court also refers to documents attached to defendant's motion to dismiss and to plaintiff's opposition.  See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (stating that a district court resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "may refer to evidence outside the pleadings").

to offset the costs of construction in exchange for reserving a portion of the units for affordable housing. See id. at 3-4; SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc., 33 F.4th 872, 874 (6th Cir. 2022).

In order to obtain financing for LIHTIC-qualifying housing developments, developers -- many of which are nonprofit organizations -- frequently allocate the tax credits attributable to the development to outside private investors. Keightley, supra 2, at 5-6. Typically, the developers and investors structure the sale through a limited partnership, with the nonprofit developers serving as the general partner, owning a small percentage of the property while managing the development on a day-to-day basis, and the investor serving as the limited partner, owning the vast majority of the development but playing an otherwise passive role. Id.

To qualify for the tax credits, owners of eligible projects must report on their compliance with the LIHTC leasing requirements annually for fifteen years, which is called the "compliance period." Compl. ¶ 26. As long as a project adheres to certain rent affordability restrictions for the compliance period, the private investor may claim tax credits annually over a ten-year period. Keightley, supra 2, at 1. Once the compliance period has

ended, the annual tax credits are no longer available. See id.; 26 U.S.C. § 42(j)(1). At this point, investor limited partners typically exit the limited partnership because "the benefits are both gone and safeguarded, because the IRS will no longer seek recapture of prior tax benefits, even if the properties fall out of compliance with LIHTC income limits or other requirements." U.S. Dep't of Hous. and Urb. Dev., What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond? 29 (Aug. 2012),

https://www.huduser.gov/portal//publications/pdf/what_happens_li htc_v2.pdf ("HUD Report").

As a result, once the compliance period ends, there is generally a risk that LIHTC developments transition away from operating as affordable housing. For this reason, 26 U.S.C. § 42(i)(7) ("Section 42(i)(7)") was enacted to encourage the continued availability of affordable housing by providing a safe harbor that protects investor limited partners from suffering negative tax consequences when they sell the developments to qualifying nonprofits at a below-market price.[2] 26 U.S.C. §§

---

[2] Section 42(i)(7)(A) provides that "[n]o Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held by . . . a qualified nonprofit organization (as defined in subsection (h)(5)(C)) . . . to purchase the property after the close of the compliance period for a price which is not

SPA-5

42(i)(7), (h)(5). Generally, the IRS treats below-market purchase options as conditional transfers of ownership to the option-holder, <u>see</u> Rev. Rul. 55-540, 1955-2 C.B. 39, § 4.01(e), which precludes owners whose interests are subject to such a right from claiming any tax benefits associated with the asset. However, under Section 42(i)(7)'s safe harbor, this general rule is inapplicable to qualifying sales. Specifically, Section 42(i)(7) allows the limited partner to grant qualifying nonprofits, among others, a right of first refusal that can be exercised at the end of the compliance period. In order to qualify for the safe harbor, the price at which the nonprofit can exercise its right of first refusal must satisfy the minimum purchase price set forth under Section 47(i)(7)(B).[3]

---

less than the minimum purchase price determined under subparagraph (B)." 26 U.S.C. § 42(i)(7).

[3] The minimum purchase price allowable to qualify for the Section 42(i)(7) safe harbor is:

[A]n amount equal to the sum of—

(i) the principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale to the tenants), and

(ii) all Federal, State, and local taxes attributable to such sale.

Except in the case of Federal income taxes, there shall not be taken into account under clause (ii) any additional tax attributable to the application of clause (ii).

26 U.S.C. § 42(i)(7)(B).

-5-

If the parties choose to take advantage of this optional safe harbor, the parties must negotiate the specific terms and conditions of that right of first refusal -- which can vary widely -- in a contract. See Compl. ¶ 37; HUD Report at 30-32 (explaining how and why the terms and conditions of a limited partner's exit process may vary depending on the context). Typically, the right of first refusal is granted via the initial partnership agreement. HUD Report at 31 n. 20. Once the right has been triggered in accordance with the contract, the party holding the right of first refusal can elect to purchase the LIHTC development for the agreed upon purchase price. However, in order to qualify for the safe harbor, that price cannot be less than the minimum purchase price required by Section 47(i)(7)(B)). Id.

**B.   The Tenants' Development II Partnership**

In the early 2000s,[4] a limited partnership, Tenants' Development II, L.P. (the "Partnership"), was formed to redevelop and own a 185-unit affordable housing development in Boston, Massachusetts pursuant to the LIHTC program. Compl. ¶¶ 9, 20. Tenants' Development II Corporation (the "General Partner"), an

_____

[4] Plaintiff alleges that the partnership was formed in 2003, however, related litigation indicates that the partnership was formed in 2002. See AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp., 15 F.4th 551, 553 (1st Cir. 2021); Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, CA No. 2084 Civ. 01260-BLS1, at 4 (Mass. Super. Ct.).

affiliate of TDC, the Nonprofit, serves as the general partner of the Partnership and owns 0.009% of the Partnership's interests. Id. ¶¶ 14, 15. In exchange for a $12 million capital contribution, AMTAX received a 99.99% ownership stake in the Partnership and the right to tax credits generated by the Property.[5] Id. ¶ 22. According to the motion papers, Alden Torch Financial LLC ("Alden Torch"), an investment management company, acquired AMTAX in 2011 and has managed AMTAX's interest in the Partnership since that time. ECF No. 33-10 ("Mot.") at 4-5; ECF No. 36 at 6; Compl. ¶ 11. Meanwhile, defendant CohnReznick has served as the Partnership's auditor and tax preparer for "approximately twenty years." Id. ¶ 1.

The Partnership and the Nonprofit had entered into a right of refusal and purchase option agreement on June 20, 2003. Id. ¶ 20; ECF No. 33-3 ("ROR Agreement"). Under this agreement, the Partnership granted the Nonprofit the right to purchase the property "in the event [the Partnership] proposes to sell, transfer, assign, or ground lease all or substantially all [the Partnership's] interest" for:

---

[5] The remaining 0.001% of the Partnership is owned by non-party Tax Credit Holdings III, LLC (together with AMTAX, the "Limited Partners"), a special limited partner that is managed by Alden Torch Financial LLC, the same investment management company that owns AMTAX. Compl. ¶ 11, 13; Mot. at 4-5.

–7–

lesser of:

>    (x) the price stated in the Disposition Notice, or

>    (y) the sum of the principal amount of outstanding
>    indebtedness secured by the Property (other than
>    indebtedness incurred within the 5-year period
>    ending on the date of any sale to the Sponsor) and
>    all federal, state and local taxes attributable to
>    such sale.

Id. §§ 2(a), (b)(ii).

On February 28, 2017, and again on April 3, 2018, the Nonprofit sent letters to AMTAX offering to purchase its interest in the Property ahead of the end of the compliance period on December 31, 2018 pursuant to Section 7.4(J) of the parties' limited partnership agreement. ECF Nos. 1-1, 1-2, 36-4. Each of these letters included a calculation performed by CohnReznick indicating the Nonprofit's proposed purchase price of $7,737,812 and $4,172,194, respectively. ECF Nos. 1-1, 1-2. According to the letters, these prices represented the "the anticipated tax liability incurred in the event of a sale of the Project, plus the amount of any tax liability attributable to the Exit Tax Distribution[6]." Id. However, the parties failed to negotiate an

---

[6] "Exit Tax Distribution" is defined in the parties' limited partnership agreement as a "priority distribution . . . in an amount equal to its tax liability incurred by the sale, plus the amount of any tax liability

early exit of the Limited Partners after disputing the existence and scope of the Nonprofit's right of first refusal. ECF No. 33-2 (<u>Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC</u>, CA No. 2084CV01260-BLS1 (Mass. Super. Ct. 2020) (the "Massachusetts Action"), Doc No. 62 (the "Massachusetts Decision")) at 6-8; <u>see also</u> Compl. ¶¶ 69-71.

On January 17, 2020, the Partnership engaged CohnReznick to calculate the price at which the Nonprofit could exercise its right of first refusal. <u>Compl.</u> ¶ 81. On February 10, 2020, the Partnership and the General Partner informed the Nonprofit of its intention to sell the Property to a third party, triggering the Nonprofit's right of first refusal. Compl. ¶ 94; ECF 33-5 (the "Disposition Notice"). Attached to the Disposition Notice was a calculation performed by CohnReznick of the right of first refusal price, totaling $17,108,380 (the "Purchase Price"), which included zero "taxes attributable to the sale" of the Property, <u>i.e.</u> exit taxes. <u>Id.</u>; Compl. ¶ 3. The next day, the Nonprofit notified the Partnership that it planned to purchase the property for the amount stated in the Disposition Notice. Compl. ¶ 96.

---

attributable to the Exit Tax Distribution taking into account any charitable donation in connection with such sale," to be paid "in the event of a sale to a qualified non-profit entity pursuant to the LURA or tax credit reservation." ECF No. 36-4 § 6.1(B).

AMTAX objected to the sale, claiming that its consent was required in order to exercise the right of first refusal.[7]  Id. ¶ 98; Mot. at 6.  As explained below, litigation ensued.  Today, the sale of the Property to the Nonprofit has not been completed.

**C.    The Federal Court Litigation**

On May 12, 2020, the Nonprofit and the General Partner filed an action against AMTAX in the District of Massachusetts, asserting diversity jurisdiction and seeking, among other things, a declaratory judgment that the right of first refusal had been validly triggered and exercised at the price calculated by CohnReznick.  Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, No. 20 Civ. 10902 (LTS) (D. Mass. May 12, 2020), ECF No. 1 ¶¶ 112-13, 151.  Shortly thereafter, AMTAX disclosed in a motion to dismiss that one member of its owner, Alden Torch, was a Massachusetts citizen, as were the Nonprofit and the General Partner, thereby destroying diversity jurisdiction.  Id., ECF No. 13.

Also on May 12, 2020, AMTAX filed a complaint, also in the District of Massachusetts, against the Nonprofit and the General Partner, seeking a declaration that the ROR Agreement did not

---

[7] According to the Massachusetts Decision, in an attempt to prevent the Nonprofit from exercising its right of first refusal, AMTAX recorded a "Notice of Consent Rights" at the Suffolk Registry of Deeds, which stated that any transfers of title require AMTAX's consent.  Massachusetts Decision at 7.  As a result of this notice, MassHousing "halted its final approval of the sale" to the Nonprofit.  Id. at 8.

comply with Section 42(i)(7), that the Nonprofit's exercise of the right was invalid, and that the ROR agreement was therefore void. AMTAX Holdings 227, LLC v. Tenants' Dev. Corp., No. 20 Civ. 10911 (D. Mass. May 12, 2020), ECF No. 1 (the "Federal Massachusetts Action"). In the alternative, AMTAX sought a declaration that the purchase price had been calculated incorrectly and that it was entitled to an exit tax distribution. AMTAX also brought various state-law claims, including claims for fraud, breach of contract, and breach of fiduciary duties. It argued that the district court had subject matter jurisdiction because the allegations concerned the meaning of the term "right of 1st refusal" in Section 42 and required the court to resolve whether the ROR Agreement violated Section 42.

On December 23, 2020, the district court dismissed both of these actions for lack of subject matter jurisdiction. Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, No. 20 Civ. 10902 (LTS), No. 20 Civ. 10911 (LTS), 2020 WL 7646934, at *1 (D. Mass. Dec. 23, 2020), aff'd on other grounds sub nom. AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp., 15 F.4th 551 (1st Cir. 2021). The United States Court of Appeals for the First Circuit affirmed the district court's decision, concluding that "[r]efined to bare essence, this [was] a dispute over a contract, the [ROR] Agreement," not an

-11-

important federal question concerning the interpretation of Section 42(i)(7). <u>AMTAX Holdings 227, LLC</u>, 15 F.4th at 557. First, the court held that Section 42 was not necessarily raised, as nothing in the statute suggests that noncompliance would void an existing right of first refusal agreement; instead, noncompliance would merely result in the unavailability of the safe harbor. <u>Id.</u> Specifically, the First Circuit found that:

> Section 42(i)(7) provides only that "no Federal income tax credit shall fail to be allowable" when a qualifying right of first refusal is in effect. Nothing in the statute either suggests or implies that it voids noncompliant right of first refusal agreements. The notion that section 42(i)(7) independently voids noncompliant agreements rather than simply making a party or a project ineligible for certain tax benefits borders on the specious and seems too thin a reed to support federal jurisdiction.

<u>Id.</u>

Second, the First Circuit found that AMTAX's claims were not substantial enough to support federal question jurisdiction. While observing that the "common thread that runs through" state-law claims that implicate substantial federal issues is the presence of "some appreciable measure of risk to the federal sovereign," the court found that this case "involve[d] no such jeopardy." <u>Id.</u> at 558. AMTAX's complaint did "not challenge – nor even implicate – concrete federal activity (such as an attempt

by the IRS to recapture the Partnership's tax credits)." <u>Id.</u>
Moreover, the court noted that it was "questionable whether the
outcome of the litigation [would] have ramifications for other
cases," as "right of first refusal agreements are sui generis,"
for which "[t]here is no standardized language . . ., nor is there
any indication that developers and investors customarily use a
one-size-fits-all prototype," nor is there a basis to conclude
"that a large number of LIHTC transactions would be affected by
the federal-law issue here." <u>Id.</u>

Finally, the First Circuit observed that "the federal
government already 'delegates' LIHTC-related compliance matters
'to state agencies as a matter of course,' . . . and it is not
clear how a state court could destabilize the program by ruling on
the meaning of section 42(i)(7)." <u>Id.</u>  Based on these findings,
the First Circuit concluded that there was no basis for subject
matter jurisdiction, as "the theory advanced by [AMTAX] . . . does
not suggest broad significance to the federal government or other
parties and, thus, lacks substantiality." <u>Id.</u>

**D.  The Massachusetts State Court Litigation**

After the Nonprofit and General Partner discovered that Alden
Torch's citizenship destroyed diversity jurisdiction in their
District of Massachusetts case, they brought a substantially

similar suit in Massachusetts state court on July 17, 2020.  <u>See</u> Massachusetts Action.   They sought, among other things, a declaration that the Nonprofit could validly exercise its right of first refusal without AMTAX's consent and that the Purchase Price was properly calculated.  <u>Id.</u>  In turn, AMTAX asserted several counterclaims, including that the General Partner breached -- and the Nonprofit aided and abetted the breach of -- its fiduciary duties by, among other things, claiming that the Purchase Price does not include an exit tax distribution to AMTAX.  Massachusetts Action, Doc. No. 17, ¶¶ 150(h), 153-159.

On June 30, 2023, after both parties cross-moved for summary judgment, the Massachusetts Superior Court issued an opinion finding in relevant part that (1) Nonprofit and General Partner were entitled to a declaration that the sale of the property to the Nonprofit did not require AMTAX's consent; (2) AMTAX was entitled to summary judgment on the remainder of the Nonprofit and General Partner's claims, concluding that the Partnership had inappropriately calculated the purchase price; and (3) the Nonprofit and General Partner were entitled to summary judgment on all counterclaims brought by AMTAX except its claim seeking a declaration that the Purchase Price had been calculated appropriately.  Massachusetts Decision at 20-24.  As to whether

exit taxes should have been included in the Purchase Price, the Massachusetts Superior Court found no clear answer after analyzing the language of the ROR Agreement, the statutory language, IRS regulations and guidance, and caselaw. Instead, the court relied on the HUD Report to conclude that exit taxes should have been included, as the Massachusetts Supreme Judicial Court had done in similar cases. Id. at 16-17. However, the court found that the improper calculation of the Purchase Price could not support AMTAX'S breach of fiduciary duty counterclaims because the Partnership's interpretation of the language in the ROR Agreement and Section 42 "reflected a colorable interpretation of language in the ROR Agreement and Section 42." Id. at 23. Specifically, the court reasoned:

> As noted above, there is no case law or regulatory guidance interpreting the phrase "taxes attributable to such sale", and the meaning of that phrase is not, at first blush, entirely clear. A legitimate dispute such as this, without more, does not amount to breach of the duty of loyalty and good faith. Second, it is unclear what harm [AMTAX] suffered given that they successfully prevented the sale . . .

Id.

The Nonprofit and General Partner applied for direct appellate review of the court's decision granting summary judgment on all but one of their claims, which the Massachusetts Supreme

Judicial Court granted on February 20, 2024.  The appeal is now pending.

**E.    This Litigation**

Finally, turning to the instant case, AMTAX alleges that CohnReznick entered into a "secret agreement" with the Partnership's general partner, TD II, to calculate a purchase price that excluded exit taxes and thereby failed to comply with Section 42(i)(7).  Compl. ¶ 6.  Specifically, AMTAX asserts four causes of action against CohnReznick: (1) breach of fiduciary duty; (2) professional negligence; (3) fraud; and (4) unjust enrichment. Id. ¶¶ 112-145.

On May 23, 2023, this Court exercised its sua sponte authority to stay the case pending the outcome of the summary judgment motions in the Massachusetts Action.  ECF Nos. 20, 24.  After the Nonprofit and General Partner filed an interlocutory appeal in the Massachusetts state court litigation, the Court lifted its stay in a July 27, 2023 conference and permitted the parties to bring their proposed motions while the appeal was pending.  ECF No. 28.  On August 11, 2023, the Court set a schedule for the parties to brief the motion to dismiss.  ECF No. 30.

On September 1, 2023, CohnReznick filed its motion to dismiss, ECF No. 33, and accompanying memorandum of law, ECF No. 33-10,

along with supporting declarations and exhibits, ECF Nos. 33-1 – 33-9.  On September 14, 2023, the Nonprofit, a non-party, filed a motion to intervene and dismiss, ECF No. 35, along with a memorandum of law, ECF No. 36, and supporting exhibits, ECF Nos. 36-1 – 36-6.  On October 6, 2023, AMTAX filed its memorandum of law in opposition to defendant's motion, ECF No. 42 ("Opp."), and on October 20, 2023, its memorandum of law in opposition to the Nonprofit's motion, ECF No. 43.  On October 30, 2023, CohnReznick filed its reply brief, ECF No. 44 ("Reply"), and on November 13, 2023, the Nonprofit filed its reply brief, ECF No. 45.  On November 17, 2023, AMTAX sought leave to file a sur-reply memorandum of law in opposition to both CohnReznick's and the Nonprofit's motions to dismiss, which the Court granted on November 20, 2023.  See ECF No. 46-1 ("Sur-Reply"); see also ECF Nos. 46-48.

## LEGAL STANDARD

CohnReznick and proposed intervenor move to dismiss this action under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim.  See Fed. R. Civ. P. 12(b)(1), (6).  "When presented with motions to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6), the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has the subject matter jurisdiction necessary to consider the merits of

the action." Khodeir v. Sayyed, No. 15 Civ. 8763 (DAB), 2016 WL 5817003, at *3 (S.D.N.Y. Sept. 28, 2016) (internal quotation marks and citation omitted); see Town of West Hartford v. Operation Rescue, 915 F.2d 92, 99 (2d Cir. 1990) ("The question of subject matter jurisdiction must be confronted at the threshold of the case.").

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). Additionally, the court may "refer to evidence outside the pleadings." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986) ("when, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise"). The burden of proof is placed on the plaintiff, who "must prove the existence of subject

matter jurisdiction by a preponderance of the evidence." <u>Moser v. Pollin</u>, 294 F.3d 335, 339 (2d Cir. 2002).

**A.   Federal Question Jurisdiction and the <u>Grable</u> Doctrine**

As "courts of limited jurisdiction," federal courts possess "only that power authorized by Constitution and statute." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994). Congress has granted federal courts jurisdiction over actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[D]eterminations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." <u>Merrell Dow Pharms. Inc. v. Thompson</u>, 478 U.S. 804, 810 (1986). Moreover, the Supreme Court has "forcefully reiterated" the "need for prudence and restraint in the jurisdictional inquiry[.]" <u>Id.</u>

Typically, plaintiffs invoke federal-question jurisdiction by pleading causes of action created by federal law. <u>See</u> <u>Gunn v. Minton</u>, 568 U.S. 251, 257 (2013). However, even when a plaintiff pleads only state-law causes of action, federal jurisdiction may still exist in "a special and small category of cases," <u>Empire Healthchoice Assurance, Inc. v. McVeigh</u>, 547 U.S. 677, 699 (2006), namely, those that "implicate significant federal issues," <u>Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308,

-19-

312 (2005) ("Grable"); see also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1019 (2d Cir. 2014) ("[T]he Supreme Court has been sparing in recognizing state law claims fitting this criterion."). It is well-settled that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharms., 478 U.S. at 813; see also Grable, 545 U.S. at 314 (the presence of a federal issue does not operate "as a password opening federal courts to any state action embracing a point of federal law.").

The Supreme Court has established a four-part test used to determine whether federal question jurisdiction exists. Grable, 545 U.S. at 314; Gunn, 568 U.S. at 258. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn, 568 U.S. at 258. This is not a balancing test -- jurisdiction is only proper "[w]here all four of these requirements are met." Id. The presence of these four factors indicates a "'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting

Congress's intended division of labor between state and federal courts." Id. (quoting Grable, 545 U.S. at 313-314).

**B.  Application**

In the instant case, AMTAX alleges that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 "because the action raises necessary, disputed, and substantial issues relating to Section 42(i)(7) of the [Internal Revenue Code] and its interplay with other provisions of the [Internal Revenue Code] and corresponding federal regulations that extend well beyond Section 42." Compl. ¶ 16.  AMTAX attempts to distinguish this case from the Federal Massachusetts Action by arguing that the case in front of the First Circuit "dealt primarily with the interpretation of the partnership agreement," Opp. at 8, while the instant case requires the Court to interpret Section 42(i)(7), see Opp. at 2, 7-8; Sur-Reply at 2.  AMTAX contends that the First Circuit declined to reach the question of whether such claims would support federal question jurisdiction.  Sur-Reply at 2; AMTAX Holdings 227, LLC, 15 F.4th at 558-59 (observing that AMTAX's complaint "suggest[ed] that interpretation of section 42(i)(7) might be necessitated by claims for breach of provisions of the Agreement requiring TD II not to endanger tax benefits and to comply with

section 42(i)(7)," but, because AMTAX never fleshed out that theory, it was not properly before the court).

CohnReznick maintains that none of the four Grable factors has been met and that the Court thus lacks subject matter jurisdiction over AMTAX's state law claims. It also argues that the Federal Massachusetts Action is instructive in that the First Circuit already found that disputes relating to the ROR Agreement do not support federal question jurisdiction. According to CohnReznick, the First Circuit's reasoning applies equally here because defendant "performed the [right of first refusal] calculation in accordance with its review of the [ROR Agreement]." Reply at 3 (emphasis in original).

This Court recognizes that the allegations and parties differ slightly in the instant case from those at issue in the Federal Massachusetts Action. However, as in the Federal Massachusetts Action, AMTAX has not sustained its burden of proving by a preponderance of the evidence that its claims depend on federal tax law rather than the parties' interpretation of a sui generis contract. Thus, the First Circuit's opinion is highly instructive to this Court's analysis. The Court will now consider each Grable prong in turn.

SPA-23

### 1. The Federal Issue is Not Necessarily Raised

The first prong of the Grable test considers whether a state law claim necessarily raises a question of federal law. This requirement is met where "the plaintiff's right to relief necessarily depends on resolution of a . . . question of federal law." Empire Healthchoice Assurance, 547 U.S. at 690 (internal quotation marks omitted); see also New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A., 824 F.3d 308, 315–16 (2d Cir. 2016) ("Jacobson") ("A state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law" (citing Grable, 545 U.S. at 314)). Federal jurisdiction only lies if "a right or immunity created by the Constitution or laws of the United States . . . [is] an element, and an essential one, of the plaintiff's cause of action." Tantaros v. Fox News Network, LLC, 12 F.4th 135, 141 (2d Cir. 2021). The inquiry "must be unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." Id. at 141-42 (internal quotation marks and citation omitted). "[A] mere speculative possibility that a federal question may arise at

some point in the proceeding" is insufficient to establish federal jurisdiction.  Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983).

Here, AMTAX argues that a federal issue is necessarily raised because its claims require the interpretation of Section 42(i)(7) and other related Internal Revenue Code (the "Code") provisions. Compl. ¶ 16.  Specifically, plaintiff alleges that (1) its breach of fiduciary duty claim depends on defendant's calculation of the purchase price in a manner that "was inconsistent with federal tax law," id. ¶ 118; (2) its professional negligence claim relates to the same calculation that "threaten[ed] the tax benefits AMTAX received over the life of the Partnership" by excluding exit taxes, Opp. at 9, Compl. ¶ 126; (3) it "reasonably relied on" defendant's misrepresentation that it would provide independent advice to protect its tax status, Compl. ¶ 139; and (4) defendant was unjustly enriched by calculating the purchase price incorrectly in order to "ingratiate itself to the low-income housing nonprofit community," id. ¶ 143; see also Opp. at 8-9.  According to plaintiff, "[e]ngrained in each of these allegations is the issue of whether CohnReznick's tax advice and calculations were consistent with federal tax law," which requires the interpretation of the Code. Opp. at 9. CohnReznick, on the other

hand, maintains that plaintiff has not necessarily raised a federal issue because "a finding . . . that [CohnReznick] owed no duty to AMTAX would result in the dismissal of AMTAX's claims without analysis of the Code." Reply at 4; see also Mot. at 12-13.

This Court agrees with CohnReznick, though based on slightly different reasoning.  Despite AMTAX's repeated attempts to characterize the purchase price as having been calculated pursuant to Section 42(i)(7), see, e.g. Compl. ¶¶ 41, 88, 118, 127, 128, 143, 145, it is clear from the documents attached to AMTAX's complaint that the price was, in fact, calculated based on the language contained in the ROR Agreement, see ECF No. 1-3 at 2-3 (an email chain between CohnReznick and TDC personnel discussing the calculation of the purchase price, in which TDC's counsel circulated the language of the ROR Agreement's purchase price provision while making no reference to Section 42(i)(7)); see also ROR Agreement at 1-2.  Thus, AMTAX's argument that its claims rest on the interpretation of Section 42(i)(7), rather than the ROR Agreement, is too tenuous to support federal jurisdiction.  See Arbaugh v. Y&H Corp., 546 U.S. 500, 513 n.10 (2006) ("A claim invoking federal-question jurisdiction . . . may be dismissed for want of subject-matter jurisdiction if it is not colorable, i.e.,

if it is 'immaterial and made solely for the purpose of obtaining jurisdiction'").

Moreover, plaintiff's attempt to compare this case to Jacobson is unavailing. Opp. at 9. Jacobson arose from a qui tam action in which defendant allegedly filed false tax returns in order to claim federal income tax exemptions for pooled residential mortgage trusts. 824 F. 3d at 317. Liability there was predicated explicitly on the interpretation of certain definitions within the Code and federal regulations, including "real estate mortgage investment conduit," "qualified mortgages," and "defective obligation." Id. at 312, 317. Here, by contrast, plaintiff simply does not assert -- nor could it given the e-mail chain attached to its complaint, ECF No. 1-3 -- that CohnReznick calculated the price based on the Section 42(i)(7) of the Code rather than the ROR Agreement. Nor does plaintiff implicate the proper interpretation of Section 42(i)(7) by alleging a breach of contract claim that the ROR Agreement obligated the parties to comply with the statute or to avoid endangering plaintiff's tax benefits. See AMTAX Holdings 227, LLC, 15 F.4th at 558-59. Rejecting AMTAX's assertion that its case "necessarily raises a federal issue," the First Circuit noted that "Section 42(i)(7) provides only that 'no Federal income tax credit shall fail to be allowable' when a qualifying

right of first refusal is in effect.  Nothing in the statute either suggests or implies that it voids noncompliant right of first refusal agreements." Id. at 557.  Therefore, this case does not "necessarily raise" the federal question of the correct interpretation of Section 42(i)(7).

### 2. The Federal Issue is Actually Disputed

Although it is not necessary for the Court to consider the remaining Grable factors, it will do so for the sake of completeness.  See Gunn, 568 U.S. at 258.  A federal issue is "actually disputed" where the question is "the central point of dispute" between the parties.  Id. at 259.  Here, AMTAX argues that the federal issue is actually disputed because its "theory of liability involves a construction of Section 42(i)(7) and an interpretation of the Code that CohnReznick disputes," Opp. at 10, while CohnReznick maintains that the central issue in dispute is whether defendant owed any duty to plaintiff "given the lack of privity between the parties," Mot. at 13.

The Court does not doubt that the parties dispute the meaning of Section 42(i)(7) and whether CohnReznick acted in accordance with the statute.  Regardless, the other three Grable requirements have not been satisfied.

### 3. The Federal Issue is Not Substantial

The third factor, that the federal issue be "substantial," requires the Court to determine whether the purported federal issue is "importan[t] . . . to the federal system as a whole." Gunn, 568 U.S. at 260. "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit." Id. Thus, "courts have typically found a substantial federal issue only in those exceptional cases that go beyond the application of some federal legal standard to private litigants' state law claims, and instead implicate broad consequences to the federal system or the nation as a whole." Pritika v. Moore, 91 F. Supp. 3d 553, 558 (S.D.N.Y. 2015); see also Gunn, 568 U.S. at 263-64 (noting that the "resolution of a patent issue in the context of a state legal malpractice action can be vitally important to the particular parties in that case," but that more is needed to "demonstrat[e] that the question is significant to the federal system as a whole"). An issue is likely to be substantial if it "present[s] a nearly pure issue of law . . . that could be settled once and for all and thereafter would govern numerous . . . other cases." Empire Healthchoice Assurance, 547 U.S. at 700. By contrast, cases that are "fact-bound and situation-specific . . . are not sufficient to establish federal arising under jurisdiction."

Gunn, 568 U.S. at 263 (internal quotation marks and citation omitted). "[S]ubstantiality must be determined based on a careful, case-by-case judgment." NASDAQ OMX Group, 770 F.3d at 1028.

According to AMTAX, the alleged federal interest here -- whether CohnReznick correctly calculated the purchase price in accordance with Section 42(i)(7) -- is "plainly substantial" because it "involves federal tax law" and "implicates not only the collection of tax revenue by the Treasury, but also the proper functioning of a federal program that is based, in significant part, on tax incentives." Opp. at 10-11. CohnReznick, on the other hand, maintains that AMTAX's claims do not implicate federal activity, as the IRS is not a party to this action, Mot. at 13-14, and plaintiff is not challenging "the Partnership's right to collect tax credits for which AMTAX has already enjoyed the benefit," Reply at 5.

AMTAX's argument is unpersuasive, as its state-law claims ultimately rest on the interpretation of the ROR Agreement's purchase price provision, not federal tax law. See supra 25-27. As the First Circuit pointed out, "right of first refusal agreements are sui generis." AMTAX Holdings 227, LLC, 15 F. 4th at 558. This point is bolstered by at least one of the publications cited in AMTAX's complaint, which explains the many ways in which

participants in the LIHTC program may structure their right of first refusal agreements with regard to both pricing and terms. Compl. ¶ 37; see HUD Report at 29-31.  Thus, this case is too "fact-bound and situation-specific," Empire Healthchoice Assurance, 547 U.S. at 700-701, to "suggest broad significance to the federal government or other parties," AMTAX Holdings 227, LLC, 15 F.4th at 558.

AMTAX attempts to avoid this outcome by relying on Grable and Jacobson for the general proposition that "claims requiring the interpretation of the federal tax code raise a substantial federal question."  Opp. at 8; see also id. at 10 (citing Grable, 545 U.S. at 315, and Jacobson, 824 F.3d at 318).  However, unlike in Grable, plaintiff's claims do not "center[] on the action of a federal agency (IRS) and its compatibility with a federal statute," but rather on a straightforward contract interpretation question triggered by a dispute between private litigants.  Empire Healthchoice Assurance, 547 U.S. at 700.

And, in Jacobson, the Second Circuit found that the federal question was substantial because the issue "govern[ed] what is now a trillion-dollar national [mortgage-backed securities] market" and because the plaintiff's claims "raise[d] a threshold question of law relating to mortgage-backed securities generally."  824

-30-

F.3d at 318.  Conversely, AMTAX has failed to "furnish[] any basis for concluding that a large number of LIHTC transactions would be affected by the federal-law issue here," *i.e.*, whether a right of first refusal negotiated between parties involved in the LIHTC program must include exit taxes when calculating the purchase price.  AMTAX Holdings 227, LLC, 15 F.4th at 558.  In fact, the HUD Report relied on by AMTAX observed that "exit taxes are not a major issue in establishing Year 15 sales prices," with "[o]nly one syndicator . . . nam[ing] recovery of exit tax liability as a goal they seek to achieve for the LP investors."  See HUD Report at 31 (emphases added).  Thus, even if AMTAX's claims did necessitate an interpretation of Section 42(i)(7), this Court is not convinced that this case would "implicate broad consequences to the federal system or the nation as a whole," which are required to establish federal question jurisdiction.  Pritika, 91 F. Supp. 3d at 558; see also Mikulski v. Centerior Energy Corp., 501 F.3d 555, 570 (6th Cir. 2007) (citing Grable, 545 U.S. at 319, for the proposition that "[w]hile the federal government may have an interest in the uniform application of regulations that relate to the collection of taxes, it has only a limited interest in private tort or contract litigation over the private duties involved in that collection. . . . The government is free to interpret and

apply the tax code as it sees fit, without the slightest regard for this lawsuit.").

Finally, plaintiff relies on Riseboro Cmty. Partnership v. SunAmerica Housing Fund No. 682, 401 F. Supp. 3d 367 (E.D.N.Y. 2020) to argue that the "proper meaning of Section 42(i)(7) is a substantial and disputed issue of federal tax law that should be decided in federal court." Opp. at 2, 11. However, Riseboro is also readily distinguishable. There, the plaintiff alleged that, in order to determine whether the term "right of 1st refusal" in Section 42(i)(7) differed from its meaning under New York common law, the applicable agreement "'[could not] be interpreted purely under New York common law, but must be interpreted to be consistent with the statutory scheme of Section 42'". Riseboro, 401 F. Supp. 3d at 373 (quoting Riseboro's complaint) (emphasis added). Because that assessment "would not be based on the specific language of the [parties' right of first refusal agreement] but rather on its interpretation of Congress' intent in drafting," the court found that this "purely legal question" was "substantial and [would] be applicable to many other LIHTC agreements nationwide." Id. at 374 (emphasis added). By contrast, AMTAX has failed to demonstrate that its claims depend on the interpretation of the Tax Code rather than the specific language of the ROR Agreement

-- in fact, its own supporting documents suggest otherwise.  ECF No. 1-3 at 2-3.  Accordingly, the Court agrees with the First Circuit that "it is questionable whether the outcome of the litigation will have ramifications for other cases."  <u>AMTAX Holdings 227, LLC</u>, 15 F.4th at 558.

### 4. The Exercise of Federal Jurisdiction Would Disrupt Congress' Carefully Drawn Scheme

Finally, the Court turns to the fourth requirement under <u>Grable</u>: whether the exercise of federal jurisdiction would disrupt the federal-state balance.  "[E]ven when the state action discloses a contested and substantial federal question . . . the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  <u>Grable</u>, 545 U.S. at 313-14.  "[D]eterminations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system."  <u>Merrell Dow Pharm. Inc. v. Thompson</u>, 478 U.S. 804, 810 (1986).  In determining whether a federal issue can be resolved in federal court without disrupting the federal-state judicial balance, courts should consider (1) whether Congress has expressed any preference for state versus federal jurisdiction over the type of claim at issue; (2) any impact on the volume of

federal court litigation if jurisdiction is accepted; (3) the possibility of causing a significant shift of what were traditionally state cases into federal cases; and (4) the litigants' interest in a federal forum. See Jacobson, 824 F.3d at 316.

AMTAX claims that a finding of federal jurisdiction here would not "trigger a voluminous amount of cases or transform state court litigation" because "it is the rare such action that hinges on the proper interpretation of an admittedly unique [right of first refusal agreement] under federal tax law." Opp. at 11 (quoting Riseboro, 401 F. Supp. 3d at 376 (internal citation and quotation marks omitted)). According to plaintiff, CohnReznick's arguments to the contrary are improperly premised on cases concerning accountant errors where the interpretation of federal tax law was not in dispute, while failing to provide any persuasive support for its position that state-law claims relating to accountant error can support federal jurisdiction. Id.

In response, CohnReznick maintains that it is well-established that state law malpractice claims cannot satisfy this Grable element, as it would open the floodgates to the filing of malpractice claims in federal court. Mot. at 15 ("Every plaintiff who has a malpractice claim against an accountant that involves

**SPA-35**

the tax Code (which accountants rely on with regularity) and every plaintiff who has a malpractice claim against a lawyer that requires interpretation of any federal statute could file such claims in federal court."). This Court agrees.

While "state court is not the traditional forum for interpretation of the federal tax laws," Jacobson, 824 F.3d at 318, the states "have 'a special responsibility for maintaining standards among members of the licensed professions,'" Gunn, 568 U.S. at 264; see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 769 (2018) (citing NAACP v. Button, 371 U.S. 415, 438 (1963)) ("Longstanding torts for professional malpractice . . . 'fall within the traditional purview of state regulation of professional conduct.'"); Klein v. Aicher, 19 Civ. 9172 (RA), 2020 WL 4194823, at *5-6 (S.D.N.Y. Jul. 21, 2020) (dismissing for lack of subject matter jurisdiction because, among other reasons, plaintiff's state law claims that required some consideration of a federal statute nonetheless raised "difficult issues" concerning legal malpractice and requirements of privity under New York law). Allowing federal jurisdiction over countless state-law tort claims concerning accountants' interpretation of the Code would clearly disrupt the appropriate balance of federal and state judicial responsibilities, as it is hardly "the rare . . . case [involving

-35-

accountant error] that raises a contested matter of federal [tax] law." Jacobson, 824 F.3d at 316 (citing Grable, 545 U.S. at 315); see also Gunn, 568 U.S. at 263-64 (federal question jurisdiction not triggered for malpractice claims relating to patent litigation because the resolution of a "hypothetical patent issue" insufficiently implicated a federal interest, particularly given state courts' role as the traditional forum for malpractice cases).

Moreover, as the First Circuit noted, Congress has delegated the oversight of compliance with LIHTC program requirements to state agencies, suggesting that states are entirely capable of interpreting the provisions of the Code relating to the LIHTC program. AMTAX Holdings 227, LLC, 15 F.4th at 558. Given this delegation, we agree that it is unclear "how a state court could destabilize the program by ruling on the meaning of section 42(i)(7)." Id.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss for lack of subject matter jurisdiction is granted without prejudice. See Katz v. Donna Karan Co., 872 F.3d 114, 121 (2d Cir. 2017) ("[W]hen a case is dismissed for lack of federal subject matter jurisdiction, Article III deprives federal courts of the power to dismiss the case with prejudice.") (internal quotation

marks and citation omitted).  Having concluded that the Court lacks subject matter jurisdiction in this case, we do not reach defendant's motion to dismiss for failure to state a claim or the Nonprofit's motion to intervene.  The Clerk of the Court is respectfully directed to terminate the motions pending at ECF Nos. 33 and 35 and dismiss the action.


        **SO ORDERED.**


Dated:    June 4, 2024
          New York, New York

 

_____
     NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE